**FILED**
2021 Jun-21 PM 12:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| TIVON ROLLIE THOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  1:19-cv-01875-MHH-HNJ |
| | ) | |
| DANIEL TIGHE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff, Tivon Rollie Thomas, filed a *pro se* complaint pursuant to 42 U.S.C. § 1983, alleging violations of his rights under the Constitution or laws of the United States.  (Doc. 1).  Thomas names the following defendants in the complaint: Correctional Officer Daniel Tighe and Correctional Officer Cody Adkins.  (Doc. 1 at 1, 2).  Thomas alleges that on October 8, 2019, Tighe and Adkins used excessive force against him in violation of the Eighth Amendment.  (Doc. 1 at 11–16).  He requests a jury trial and seeks monetary relief against the defendants in their individual capacities. (Doc. 1 at 2, 16).

In accordance with the usual practices of this court and 28 U.S.C. § 636(b)(1), the court referred the complaint to the undersigned Magistrate Judge for a preliminary report and recommendation. *See McCarthy v. Bronson*, 500 U.S. 136 (1991).  For the following reasons, the undersigned recommends the court deny the defendants' motion for summary judgment.

## I. PROCEDURAL HISTORY

On May 14, 2020, the court entered an Order for Special Report, directing the Clerk to forward copies of the complaint to each of the named defendants and directing the defendants to file a Special Report addressing Thomas' factual allegations. (Doc. 8 at 4). The court advised the defendants that the Special Report could be submitted under oath or accompanied by affidavits and, if appropriate, the court would consider it as a motion for summary judgment filed pursuant to Rule 56 of the *Federal Rules of Civil Procedure.* (Doc. 8 at 4, 8–9).

On August 11, 2020, the defendants filed a Special Report, supplemented by affidavits and institutional documents. (Doc. 16). The court notified the parties that the court would construe the Special Report as a motion for summary judgment and notified Thomas that he had 21 days to respond to the motion for summary judgment by filing affidavits or other material. (Doc. 19). The court also advised Thomas of the consequences of any default or failure to comply with Fed. R. Civ. P. 56. *Id. See Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985). Thomas filed a response on September 28, 2020. (Doc. 21). This matter now proceeds before the court on the defendants' motion for summary judgment and Thomas' response thereto.

## II. STANDARD OF REVIEW

Because the court has construed the defendants' Special Report as a motion for summary judgment, Fed. R. Civ. P. 56 governs the resolution of the motion. Under Rule 56(a), summary judgment is proper "if the movant shows that there is no genuine

2

dispute as to any material fact and the movant is entitled to judgment as a matter of law." In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Chapman v. AI Transport,* 229 F.3d 1012, 1023 (11th Cir. 2000). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues of material fact and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial, and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Bennett v. Parker,* 898 F.2d 1530, 1532-33 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [citations omitted]. Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett,* 898 F.2d at 1532.

However, any "specific facts" pled in a *pro se* plaintiff's sworn complaint must be considered in opposition to summary judgment. *See Caldwell v. Warden, FCI Talladega,* 748 F.3d 1090, 1098 (11th Cir. 2014) (citing *Perry v. Thompson,* 786 F.2d 1093, 1095 (11th

3

Cir. 1986)).   Additionally, because plaintiff is *pro se*, the court must construe the complaint more liberally than it would pleadings drafted by lawyers. *Hughes v. Rowe*, 449 U.S. 5, 9 (1980). A *pro se* pleading "is held to a less stringent standard than a pleading drafted by an attorney" and is liberally construed. *Jones v. Fla. Parole Comm'n*, 787 F.3d 1105, 1107 (11th Cir. 2015).

### III. SUMMARY JUDGMENT FACTS[1]

On October 8, 2019, about 8:30 p.m., Correctional Officer Daniel Tighe was passing out ice to inmates. (Doc. 1 at 11). Tighe approached Thomas' cell, C-74, and asked if he wanted ice, but Thomas declined. (Doc. 1 at 11). Tighe closed Thomas' tray door and moved to the next cell. (Doc. 1 at 12). An inmate in C-75, a neighboring cell, began striking his door.[2] (Doc. 1 at 12). Tighe returned to Thomas' cell and asked if he was hitting the door. (Doc. 1 at 12). Thomas immediately responded that he was not. (Doc. 1 at 12). Tighe left Thomas' cell and continued to pass out ice. (Doc. 1 at 12).

The inmate in C-75 began striking his door again. (Doc. 1 at 12). Thomas was looking out of the window of his cell door to see what was going on when Tighe returned to Thomas' cell. (Doc. 1 at 12). Tighe smiled at Thomas and opened Thomas'

---

[1] Based on the foregoing summary judgment standard, the following facts are undisputed or, if disputed, taken in a light most favorable to the non-moving party. Factual disputes are addressed in footnote form.

[2] Inmate James Breedlove submitted an affidavit wherein he states that he occupied cell C-75 and struck the window of his cell door on October 8, 2019. (Doc. 18 at 16–17, Breedlove Aff.).

tray door. (Doc. 1 at 13). Thomas kneeled and put his face near the tray door so he could hear Tighe because the exhaust system in the dormitory is loud. (Doc. 1 at 13). However, Tighe did not say anything; instead, he sprayed Thomas in the face with pepper spray for several seconds. (Doc. 1 at 13; Doc. 18 at 12–13, Smart Decl.). Thereafter, Tighe closed the tray door and left.[3] (Doc. 1 at 13).

Thomas used the sink in his cell to attempt to wash the pepper spray from his eyes. (Doc. 1 at 13). Correctional Officer Charles Adkins arrived at Thomas' cell and opened the tray door. (Doc. 1 at 13). Adkins instructed Thomas to turn around and place his hands through the tray door so that Adkins could handcuff him. (Doc. 1 at 13). Thomas complied and Adkins handcuffed him behind his back. (Doc. 1 at 13).

Officer Adkins grabbed Thomas and escorted him toward the front entrance. (Doc. 1 at 13). Adkins' right hand was wrapped around the back of Thomas' neck and Thomas still had pepper spray in his eyes. (Doc. 1 at 14). The shift's response team had arrived on the scene and was questioning Tighe. (Doc. 1 at 13). Adkins asked Thomas what happened and then rammed Thomas' head into a wall.[4] (Doc. 1 at 14). Thomas

---

[3] Tighe states that on October 8, 2019, at approximately 8:30 p.m., he was conducting ice and juice call when he heard loud banging coming from Thomas' cell. (Doc. 16-2, Tighe Aff. at 1). Tighe alleges he returned to Thomas' cell and instructed him to stop banging on his cell door. (Doc. 16-2, Tighe Aff. at 1). Tighe asserts that Thomas refused and became verbally combative. (Doc. 16-2, Tighe Aff. at 1). Tighe states he called for a supervisor and instructed Thomas again to stop banging on his door, but Thomas refused. (Doc. 16-2, Tighe Aff. at 1). Tighe claims he deployed a one second burst of Sabre Red spray to Thomas to gain compliance. (Doc. 16-2, Tighe Aff. at 1).

[4] Officer Adkins responded to Tighe's call for assistance involving Thomas. (Doc. 16-3, Adkins Aff. at 1). After Tighe sprayed Thomas with Sabre Red, Adkins handcuffed Thomas. (Doc. 16-3, Adkins Aff. at 1). Lieutenant Michael Jones entered the dormitory and instructed officers to remove Thomas

5

lost consciousness and fell.[5]  (Doc. 1 at 14).  When Thomas regained consciousness, he was face down on the ground, lying in blood, with his hands still cuffed behind him.[6]  (Doc. 1 at 14).

Officers lifted Thomas to his feet and escorted him to the Health Care Unit.  (Doc. 1 at 14).  A nurse examined Thomas and informed him that he had a severe laceration on his ear.  (Doc. 1 at 14; Doc. 16-4 at 24).  The nurse also noted a moderate

---

from his cell and escort him to the Health Care Unit for decontamination.  (Doc. 16-3, Adkins Aff. at 1).  When Lieutenant Jones questioned Thomas, he responded that Tighe sprayed him for kicking the door.  (Doc. 16-3, Adkins Aff. at 1).  Adkins claims Thomas began yelling at Tighe, and Jones then instructed Adkins to escort Thomas to the lobby.  (Doc. 16-3, Adkins Aff. at 1).  Adkins contends that he assisted in escorting Thomas toward the lobby area using "the two-on-one escort position" when Thomas began struggling and appeared to attempt to pull away from his grasp.  (Doc. 16-3, Adkins Aff. at 1).  Adkins states that he ordered Thomas to stop, but he refused and turned to him yelling that the spray was burning him.  (Doc. 16-3, Adkins Aff. at 1).  Adkins alleges that Thomas spit in Adkins' face as he was yelling.  (Doc. 16-3, Adkins Aff. at 1).  Adkins states he instructed Thomas to stop yelling and spitting, but he continued to struggle and yell.  (Doc. 16-3, Adkins Aff. at 1).  Adkins alleges he began to lose his balance so he "executed the escort disengage" with Thomas so Adkins would not fall.  (Doc. 16-3, Adkins Aff. at 1).  He claims Thomas fell against the wall and hit his right ear.  (Doc. 16-3, Adkins Aff. at 1).  Adkins alleges he helped Thomas to his feet and escorted him outside the dormitory where Lieutenant Jones came to interview him.  (Doc. 16-3, Adkins Aff. at 1).  Adkins contends he had no further dealings with Thomas.  (Doc. 16-3, Adkins Aff. at 1).

[5] Thomas has submitted the sworn statements of inmates Germaine Smart, Antoine Rudolph, and James Breedlove, who state that they witnessed Adkins ram Thomas' head into the wall.  (Doc. 18 at 12–13, Smart Decl.; Doc. 18 at 14–15, Rudolph Aff.; Doc. 18 at 16–17, Breedlove Aff.).  Rudolph and Breedlove specifically state that Thomas never resisted.  (Doc. 18 at 14, Rudolph Aff.; Doc. 18 at 16, Breedlove Aff.).

[6] The Incident Report states that as Adkins and Officer Venturi escorted Thomas to the Health Care Unit, Thomas became belligerent and attempted to pull away from Adkins.  (Doc. 16-5 at 1).  The report notes that Adkins disengaged and Thomas "ran into the wall causing injury" to his ear.  (Doc. 16-5 at 1). The Incident Report contends that Thomas admitted to kicking the door but denied trying to pull away from Adkins, claiming instead that he was attempting to turn around to ask Tighe why Tighe sprayed him.  (Doc. 16-5 at 1).  The Incident Report further notes that Thomas stated he slipped while trying to turn and ran into the wall.  (Doc. 16-5 at 1).

amount of blood and disfigurement to Thomas' ear.[7]  (Doc. 16-4 at 25).  Prison staff

transported Thomas to Crestwood Medical Center where he received 16 stitches to his

ear.  (Doc. 1 at 14; Doc. 16-5 at 2).  Hospital staff also prescribed Thomas antibiotics.[8]

(Doc. 1 at 15).

Tighe charged Thomas with failing to obey a direct order by continuing to hit

his cell door when Tighe instructed him to stop.  (Doc. 16-6 at 1).  During the

disciplinary hearing, Thomas stated that it was a neighboring inmate kicking the cell

door.  (Doc. 16-6 at 2).  He stated that Tighe approached his cell and asked if he was

kicking and Thomas responded no.  (Doc. 16-6 at 2).  Thomas claimed when the kicking

continued, Tighe returned to his cell, opened the tray door, and sprayed him in the face

with pepper spray.  (Doc. 16-6 at 2).  In addition, Inmate James Breedlove, who was

assigned to cell C-75, which is next to Thomas' cell, testified that he was the one striking

the window on his cell door.  (Doc. 16-6 at 2).  The hearing officer found Thomas guilty

of the charge and recommended Thomas' placement in disciplinary segregation for 45

days along with loss of canteen, telephone, and visiting privileges for 45 days.  (Doc.

---

[7] Prison staff took pictures of Thomas' injury.  (Doc. 16-9 at 1–2).  The black and white pictures show what appears to be blood on Thomas' shirt, but do not depict the severity of his right ear laceration.  (Doc. 16-9 at 1–2).

[8] On October 8, 2019, Thomas completed an unsworn "Use of Force Inmate Written Statement" wherein he denied kicking his cell door.  (Doc. 1 at 23).  Thomas alleged that Tighe opened his tray door and sprayed him with pepper spray while smiling.  (Doc. 1 at 23).  He asserted that he complied with Adkins' request to submit to handcuffs.  (Doc. 1 at 23).  Thomas contends that after he exited the cell, Adkins asked him what happened, and Thomas attempted to face Adkins while responding to him, but he could not see because of the pepper spray in his eyes.  (Doc. 1 at 23).  Thomas states Adkins grabbed Thomas by the handcuffs and slammed him headfirst into the wall.  (Doc. 1 at 23).

16-6 at 2).    Warden Stephen Langford approved the finding of guilt and the recommended sanctions.  (Doc. 16-6 at 3).

On November 14, 2019, prison medical staff removed the stiches from Thomas' right ear and found that the wound was intact.  (Doc. 16-4 at 28).  Medical staff cleaned the area and noted no swelling or drainage.  (Doc. 16-4 at 28).

On January 22, 2020, Thomas submitted a sick call request wherein he stated that an officer slammed his head into a wall a few months prior, and he was now experiencing headaches and "light flashes" in his left eye.  (Doc. 16-4 at 20).  On January 25, 2020, prison medical staff examined Thomas for his complaints of headaches, recommended acetaminophen or ibuprofen, and instructed him to return to sick call if there was no improvement.  (Doc. 16-4 at 19).  Medical staff continued to evaluate Thomas for his repeated complaints of headaches, prescribe him medications, and referred him for an x-ray and an appointment with an ophthalmologist.  (Doc. 16-4 at 29–34).  On March 19, 2020, Thomas underwent an x-ray of his skull for his complaints of headaches.  (Doc. 16-4 at 10).  The radiology report noted no acute bone abnormality.  (Doc. 16-4 at 10).

Thomas states he had a previous incident with Adkins which he believes is related to Adkins's use of force on October 8, 2019.  (Doc. 1 at 19–20, 22).  He also claims Tighe has been disciplined previously for using unjustified force against inmates. (Doc. 1 at 15).

## IV. ANALYSIS

## A. Excessive Force

Thomas alleges that on October 8, 2019, Tighe opened his tray door and sprayed him in his face with pepper spray, and Adkins rammed his head into a wall while he was handcuffed. (Doc. 1 at 11–14). Thomas contends that he was not disobeying orders or posing any threat to Tighe or Adkins, and thus, their use of force was excessive. (Doc. 1 at 11–14). Tighe and Adkins' motion for summary judgment on Thomas' Eighth Amendment excessive force claims warrants denial.

Governing legal principles require analysis of Thomas' excessive force allegations against the defendants under the standard set forth by the United States Supreme Court in *Hudson v. McMillian*, 503 U.S. 1 (1992) and *Whitley v. Albers*, 475 U.S. 312 (1986). *See Campbell v. Sikes*, 169 F.3d 1353, 1374–75 (11th Cir. 1999). In *Hudson v. McMillian*, the Supreme Court held that in assessing an inmate's excessive force claim, "the core judicial inquiry is that set out in *Whitley*: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6–7. In extending *Whitley* to all cases involving allegations of the use of force by prison officials, the Supreme Court reasoned:

> Many of the concerns underlying our holding in *Whitley* arise whenever guards use force to keep order. Whether the prison disturbance is a riot or a lesser disruption, corrections officers must balance the need "to maintain or restore discipline" through force against the risk of injury to inmates. Both situations may require prison officials to act quickly and decisively. Likewise, both implicate the principle that "'[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are

needed to preserve internal order and discipline and to maintain institutional security.'"

*Hudson*, 503 U.S. at 6 (citations omitted).

With these concerns in mind, the Supreme Court set out certain factors that courts should consider when evaluating whether force used was excessive. These factors include: (1) the need for application of force; (2) the relationship between that need and the amount of force used; (3) the threat reasonably perceived by the responsible official; (4) any efforts to temper the severity of a forceful response; and (5) the extent of the injury suffered by the inmate. *Whitley v. Albers*, 475 U.S. at 321.

In applying the foregoing factors to the facts of a particular case, the Supreme Court has instructed:

> That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of "cruel and unusual" punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort "'repugnant to the conscience of mankind.'"

*Hudson*, 503 U.S. at 9 (citations omitted). Thus, to create a genuine issue of material fact, a plaintiff must come forward with evidence from which a reasonable inference can be drawn that the defendant acted maliciously and sadistically.

Thomas alleges that an inmate in a cell C-75 was striking his door as Tighe passed out ice on October 8, 2019. (Doc. 1 at 11–12). Thomas states that when Tighe asked if he was kicking the door, he immediately responded that he was not. (Doc. 1 at 12). Thomas alleges that Tighe resumed his duties, but the inmate in cell C-75 began striking

10

his door again.  (Doc. 1 at 12).  Thomas claims that after Tighe returned to Thomas' cell, Thomas kneeled to put his face near the tray door so he could hear Tighe, and then Tighe, smiling, sprayed him in the face with pepper spray for several seconds.  (Doc. 1 at 12–13; Doc. 18 at 12–13, Smart Decl.).   Thomas contends that he complied with Adkins' instructions to be handcuffed.  (Doc. 1 at 13).  Thomas claims that as Adkins escorted him to the Health Care Unit, Adkins rammed his head into a wall.  (Doc. 1 at 14).  As a result, Thomas sustained serious injury to his right ear which required 16 stitches.  (Doc. 1 at 14).

Construing the facts in a light most favorable to Thomas, defendants Tighe and Adkins intentionally and maliciously harmed him when Tighe sprayed him in his face with pepper spray for several seconds and Adkins rammed his head into a wall, causing serious injury to his ear.  Moreover, defendants did not need to use such force to restore or maintain discipline at the time as Thomas was not creating a disturbance or resisting orders, and he was already handcuffed behind his back.

On the other hand, defendant Tighe claims that Thomas disobeyed orders to stop kicking his cell door.  (Doc. 16-2, Tighe Aff. at 1).  Tighe contends that he sprayed Thomas with a one second burst of Sabre Red to gain his compliance.  (Doc. 16-2, Tighe Aff. at 1).  Adkins claims that as he was escorting Thomas to the Health Care Unit, Thomas became belligerent, shouted and spit on him, and attempted to break away.  (Doc. 16-3, Adkins Aff. at 1).  Adkins alleges that he disengaged Thomas and Thomas fell into the wall and hit his right ear.  (Doc. 16-3, Adkins Aff. at 1).

11

Assessing the credibility of allegations rendered by a plaintiff or a defendant exceeds the scope of a trial court's authority on a summary judgment motion. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also, Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742–43 (11th Cir. 1996). The facts presented by the parties depict a genuine dispute exists between Thomas' and defendants' version of the facts in connection with the events that took place on October 8, 2019, and whether defendants used excessive force against Thomas. Therefore, defendants Tighe and Adkins' motion for summary judgment on Thomas' Eighth Amendment excessive force claims warrants denial.

Thomas claims that Tighe sprayed him directly in his face with pepper spray for several seconds at close range. (Doc. 1 at 13; Doc. 18 at 12–13, Smart Decl.). The defendants contend that Thomas' body chart does not indicate that he suffered an injury related to the use of the pepper spray. (Doc. 16 at 6; Doc. 16-8). Thus, the defendants argue that Thomas' injury was *de minimis* and summary judgment on this claim is appropriate. (Doc. 16 at 6–7).

The extent of an injury constitutes one factor in determining whether an inmate was subjected to excessive force. In *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010), the U.S. Supreme Court clarified that the purpose of *Hudson* was to "shift the 'core judicial inquiry' from the extent of the injury to the nature of the force—specifically, whether [the force] was nontrivial and 'was applied . . . maliciously and sadistically to cause harm.'" (quoting *Hudson*, 503 U.S. at 7). Indeed, in the context of an Eighth

12

Amendment excessive force claim, the Supreme Court has recognized that "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Wilkins v. Gaddy*, 559 U.S. at 38.  If defendant Tighe opened Thomas' tray door and sprayed him directly in his face with pepper spray at close range for several seconds when Thomas was not creating a disturbance or disobeying any orders, Tighe's conduct would exceed a *de minimis* use of force and would rise to the level of force used maliciously and sadistically to cause harm.   *Hudson*, 503 U.S. at 6–7.

Moreover, a plaintiff claiming violation of his constitutional rights may recover nominal damages even if he suffered no compensable injury.  *See Brooks v. Warden*, 800 F.3d 1295, 1308 (11th Cir. 2015); *Hughes v. Lott*, 350 F.3d 1157, 1162 (11th Cir. 2003) ("Nominal damages are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages.").  In addition, the Eleventh Circuit held recently that 42 U.S.C. § 1997e(e) does not bar a prisoner from recovering punitive damages for mental or emotional injury in the absence of physical injury.[9] *See Hoever v. Marks*, 993 F.3d 1353, 1362 (11th Cir. 2021) ("[A] plaintiff—at least one alleging a constitutional violation—

---

[9]    Title 42 U.S.C. § 1997e(e) states:

> No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18).

need not allege a compensable injury to seek punitive damages, so long as he plausibly alleges that the underlying misconduct was willful or malicious."). Thus, Thomas' excessive force claim against Tighe does not merit dismissal simply because there exists no medical evidence that he sustained a serious physical injury after Tighe sprayed him with pepper spray.

### B. Qualified Immunity

The defendants argue they are entitled to qualified immunity regarding Thomas' excessive force claims. (Doc. 16 at 11–12). "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quotation marks and citations omitted). To obtain qualified immunity, the government official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quotation marks and citations omitted). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity in not appropriate." *Id.* Plaintiff must show that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004) (footnote omitted).

There exists no dispute defendants were acting within the scope of their discretionary authority when they allegedly used excessive force against Thomas on October 8, 2019. Because there exists a question of fact concerning whether the defendants used excessive force against Thomas, the defendants are not entitled to qualified immunity. Specifically,

> a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force "maliciously and sadistically to cause harm" is clearly established to be a violation of the Constitution . . . . There is simply no room for a qualified immunity defense when the plaintiff alleges such a violation. The only question, then, is whether the plaintiff has alleged facts sufficient to survive a . . . motion for summary judgment. If he has done so, that is the end of the inquiry.

*Skrtich v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002) (citations omitted).

Because Thomas has alleged facts sufficient to survive a motion for summary judgment concerning his Eighth Amendment excessive force claims against Tighe and Adkins, the defendants' motion for summary judgment based on qualified immunity warrants denial.[10]

## V. RECOMMENDATION

---

[10] The defendants also contend that the Eleventh Amendment bars Thomas' claims against them in their official capacities for monetary damages. (Doc. 16 at 10–11). However, Thomas expressly noted in his complaint that he intended to sue the defendants in their individual capacities only. (Doc. 1 at 2, 10).

For the reasons stated above, the undersigned **RECOMMENDS** the court **DENY** the defendants' motion for summary judgment on Thomas' Eighth Amendment excessive force claims.

## VI. NOTICE OF RIGHT TO OBJECT

Any party may file specific written objections to this report and recommendation. A party must file any objections with the Clerk of Court within 14 calendar days from the date the report and recommendation is entered. Objections should specifically identify all findings of fact and recommendations to which objection is made and the specific basis for objecting. Objections also should specifically identify all claims contained in the complaint that the report and recommendation fails to address. Objections should not contain new allegations, present additional evidence, or repeat legal arguments. An objecting party must serve a copy of its objections on each other party to this action.

Failing to object to factual and legal conclusions contained in the magistrate judge's findings or recommendations waives the right to challenge on appeal those same conclusions adopted in the district court's order. In the absence of a proper objection, however, the court may review on appeal for plain error the unobjected to factual and legal conclusions if necessary in the interests of justice. 11th Cir. R. 3-1.

On receipt of objections, a United States District Judge will review *de novo* those portions of the report and recommendation to which specific objection is made and may accept, reject, or modify in whole or in part, the undersigned's findings of fact and

recommendations.  The district judge must conduct a hearing if required by law. Otherwise, the district judge may exercise discretion to conduct a hearing or otherwise receive additional evidence.  Alternately, the district judge may consider the record developed before the magistrate judge, making an independent determination on the basis of that record.  The district judge also may refer this action back to the undersigned with instructions for further proceedings.

A party may not appeal the magistrate judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  A party may only appeal from a final judgment entered by a district judge.

**DONE** this 21st day of June, 2021.

                  HERMAN N. JOHNSON, JR.
                  UNITED STATES MAGISTRATE JUDGE